UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:24 CR 52 - PPS - JEM |
| | ) | |
| ANTHONY MAYERS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Anthony Mayers is charged with a variety of crimes mostly related to sex trafficking. He attacks the evidence against him in a series of motions. This order covers four of Mayers' motions: (1) Motion to Suppress Defendant's Statement [DE 71]; (2) Motion to Suppress Evidence Seized from the Residence at 2508 Jefferson Avenue Basement Apartment [DE 73]; (3) Motion to Suppress Search of Contents of Cell Phone [DE 74]; and (4) Motion for Reconsideration of Bill of Particulars [DE 123]. All fail for various reasons.

In summary, first, Mayers' statements made to law enforcement were voluntary and pursuant to a valid *Miranda* waiver. Second, although there are some irregularities in how it was obtained, the evidence seized from Mayers' apartment was obtained pursuant to a valid warrant. Third, the opening of Mayers' cell phone to retrieve identification information does not necessitate suppression of evidence gained through later valid search warrants. And lastly, a bill of particulars is not necessary because the

requisite information has been provided through discovery.

## Background Facts

There were two investigations being conducted into the sex trafficking operation of Anthony Mayers.  The Gary Police Department had a narrow investigation relating solely to an incident that occurred on November 29, 2023 and involving a single victim. By contrast, the FBI had a much broader investigation involving several victims and playing out over several years. The suppression hearing in this case focused almost exclusively on Gary's more narrow investigation.

Several individuals testified at the evidentiary hearing that began on January 26, 2026, and reconvened on January 30, 2026.  The Government first called Olivia Vasquez, the primary detective for the Gary Police Department during the time of the search. When she worked for the Gary Police Department, she investigated approximately 800 cases a year. [DE 124 at 16.]  During her career, she interviewed thousands of victims. [*Id.* at 17.]

On November 29, 2023, Sergeant Tatum told Det. Vasquez about an incident occurring at 2508 Jefferson Street, in Gary.  *Id.*  Sergeant Tatum advised Vasquez that he, along with other officers, responded to that location after Lake County dispatch had received a 911 call from a female who stated she needed an ambulance for a possible broken nose. [*Id.* at 19.]  He went to the scene where they tried to make contact with the female, but a male inside the house— later identified as the defendant Anthony Mayers—wouldn't let her out of the house, and simultaneously refused to allow officers

2

inside for some period of time.  But Sergeant Tatum knew that something was amiss because, as he relayed to Vasquez, Tatum saw the woman through the window mouth the words "help me."  *Id.*

Ultimately, while the officers were talking to Mayers through the window, the woman escaped out the back of the house and was taken for treatment to Methodist Northlake Hospital.  She told the officers she was being held against her will and forced to perform sex acts. [*Id.* at 19-20.]  Based upon this information, at least one officer stayed at the residence and "maintain[ed] a perimeter," making sure no one entered or left the residence. [*Id.* at 20.]

Det. Vasquez then headed to the hospital for a brief interview with the victim. She wanted to obtain information directly from the victim to determine if she had probable cause to get a search warrant. [*Id.* at 22.]  When Vasquez saw her at the hospital, the victim's face appeared freshly swollen—her nose appeared to be swollen and bruised and she sounded stuffy, like she was having a hard time breathing through her nose. [*Id.* at 23-24.]  She was constantly wiping her nose with a tissue. [*Id.* at 23.]  The woman credibly told Vasquez she was staying in the residence with a man named "Mo" and he battered her. [*Id.* at 23-24.]

After obtaining this first-hand information, Vasquez drafted a residential warrant for the Jefferson residence. [*Id.* at 28-29.]  She sent the draft to Lake County Deputy Prosecutor Infinity Westberg. [*Id.* at 29.]  Ms. Westberg then advised Vasquez that the magistrate believed the requested warrant was too broad, so they decided to

3

narrow the search warrant. [*Id.* at 30.]

Around 1:20 p.m. the government received an initial warrant which allowed for the seizure of any and all cell phones or electronic devices, cameras or electronic storage devices; any and all bills, receipts, schedules, calendars, journals notes, and/or any other typed, printed, and/or written documents or paperwork related to human trafficking; any and all firearms or ammunition; money or any form of payment in reference to illegal activity. [*Id.* at 31-32; Gov. Ex. 1.]

Pursuant to that warrant, law enforcement officers from Gary made initial entry into Mayers' house around 3:23 p.m. on November 29, 2023. [*Id.* at 33-35.] Vasquez believes when she entered, the scene looked like the picture depicted in Government Exhibit 2 with the exception that a phone wasn't sitting on the window ledge anymore, it was plugged in and charging on a radiator. [*Id.* at 36.] Vasquez and the officers also saw a locked door, and when they entered that room, it appeared to be a "sex room." *Id.* There was a chalkboard on the wall that said "Whatever daddy wants, daddy gets," there was red lighting, condoms, soiled bedding, and a bloody tissue. *Id.* Based upon these observations, Vasquez notified Prosecutor Westberg, who began drafting another request for a broader search warrant. Because Vasquez was at the scene (and couldn't access a computer), Westberg drafted the request for the second warrant based on what she was being told by Vasquez. [*Id.* at 39, 48.] The scene at the residence was a little chaotic, and during all of this, Westberg and Vasquez were communicating with each other via phone, texts, and e-mail.

4

As mentioned above, when Vasquez first saw the cell phone, it was plugged in, on top of a radiator. [*Id.* at 40; Gov. Ex. 4.] She said Sergeant Flores may have touched it before that, but she wasn't sure. *Id.* The phone was unlocked when Vasquez saw it, and the display seemed to be of images from a security camera trained on the outside of the house. *Id.* Vasquez wanted to obtain a search warrant to view the content of the phone. [*Id.* at 41.] Prosecutor Westberg asked for the identifiers from the phone so that the phone could be particularly described in the search warrant application. According to Vasquez, another team member held the phone with a gloved hand so that Vasquez could obtain the information (which appears to come from the "about" page on the cell phone). [*See* phone depicted in Gov. Ex. 12A; DE 124 at 38, 44-49.] Vasquez then sent the photograph of the identifiers to Prosecutor Westberg in preparation of getting the second warrant. [*Id.* at 47-48.]

What is odd is that the phone could just as easily have been described in the search warrant application without reference to the identification number and phone identifiers. For example, it could have been particularly described by color, model and the specific location where it was found. Or it could have been physically brought to the magistrate judge. Although the phone had been moved from its initial location, plugged in, and the identifier pulled up, Vasquez unequivocally testified that "[a]t no point in my mind did anybody do an actual search of the phone. We weren't looking for photos or evidence or anything like that. I know we need a warrant to get into the phone to dump the contents." [DE 124 at 107.]

5

Later that same afternoon, at 4:08 p.m., Vasquez received an e-mail from Prosecutor Westberg. [Gov. Ex. 6.]  The full e-mail reads like this: "Here is a further warrant for the house.  I included the cell phone info but you will need to do a new warrant for the phone after you interview her about what exactly he does on it. Magistrate Sullivan will want you to be specific in order to do a total dump of the phone.  Let me know if it's good to resubmit." [Gov. Ex. 6.]  Vasquez was still in the house when she received this e-mail, quickly read it on her phone, and testified "[i]t was my understanding when I received that e-mail from her that we had received that second warrant." [DE 124 at 50.]  In other words, Vasquez believed the e-mail meant the government had already obtained the second warrant when in reality, the prosecutor was asking her to review the draft before the request for the second warrant was submitted to the magistrate judge. [DE 124 at 81.]

At this time, the search team continued with what they were doing—photographing the rooms and viewing the residence for potential evidence. [*Id.* at 51.]  On cross examination, Mayers' counsel pointed out that the search warrant return form [Gov. Ex. 8] indicates that the search warrant was executed at 3:23 p.m., but Vasquez testified that 3:23 p.m. was the time they first entered the house, and the seizure of the items didn't technically occur until closer to 8:00 p.m., when they left the residence.  [*Id.* at 90-91, 97.]  Regarding the second warrant, there is a notation on that document that it was executed at 4:09 p.m. [Def. Ex. C; DE 124 at 93-94, 107-08.] Vasquez again explained she thought the e-mail from Westberg was confirmation that

they received the second warrant, so she wrote 4:09 on the document after she read that e-mail. [DE 124 at 108.]

In reality, the magistrate judge signed the second warrant at 7:08 p.m. [*Id.* at 144; Gov. Ex. 7 at 4.]  It covered additional items such as two cell phones, a scale, about $10,000 in currency, guns, bed sheets, condoms, a plastic baggy containing a powder, and the tissue with possible blood. [Gov. Ex. 7 at 3-4.]

Ms. Infinity Westberg,  the special victims prosecutor from Lake County, also testified on behalf of the government at the evidentiary hearing.  She explained the typical way the government obtained a warrant. [Tr. 124 at 134-36.]  Regarding the first request for a warrant, Magistrate Judge Sullivan thought it was too broad since they originally requested any instrumentalities leading to human trafficking and also to search the person of anyone in the house. [*Id.* at 136.]  The Judge told the government if they developed more probable cause or determined they needed specific items, they could later request a second warrant. [*Id.* at 137.]

The initial search warrant issued by Judge Sullivan was issued at 1:18 p.m. on November 29. *Id.*  When Westberg received the warrant, she e-mailed it to Detective Vasquez. *Id.*  She explained that law enforcement typically will get a warrant to seize whatever electronics are available, and then later get another warrant to actually extract the data from those items. [*Id.* at 138.]

After deciding to request a second warrant, Westberg confirmed that she requested any identifiers from the phone. [*Id.* at 138-29.]  She also confirmed that based

7

on the initial information received from Vasquez regarding what they found in the home, the government decided it had probable cause to seek the expanded second search warrant of the house. [*Id.* at 141.] Westberg confirmed that when she sent Vasquez the e-mail saying "here is the other warrant" she was asking Vasquez to review it before Westberg submitted it to Judge Sullivan for her review. [*Id.* at 142.]  The second warrant was not actually signed by Judge Sullivan until 7:08 p.m. on November 29, 2023. [*Id.* at 144.]  And then several days later, Westberg got a search for the entire contents of the cell phone. [*Id.* at 145.]

The defense called as a witness Detective James Nielsen with the City of Gary Police Department, who was also at the scene of the residential search.  He was aware that the phone might have originally been moved at the scene to be plugged in. [DE 125 at 167.]  When he talked to Detective Green, who had also been assigned this case (and is part of the Real-Time Crime Center), Green assured Nielsen he had not gone through the cell phone. [*Id.* at 168.]  If anyone had gone through the phone, Nielsen thought it would have been Detective Vasquez. [*Id.* at 171.]  Nielsen believes he left the residence around 8:30 p.m., at the conclusion of the search.  [*Id.* at 176.]

The day after the search of the residence, Vasquez went with her partner, Detective Figueroa, to the Gary Police Department Jail. [DE 124 at 53.]  They went to Mayers' cell, introduced themselves, and then went to prepare an interview room.  *Id.* At no point during their interaction with him did Mayers indicate he did not want to be interviewed, rather, when they asked if he was ready to make a statement, he agreed.

[*Id.* at 53, 74.] Vasquez testified to the bare conditions of the holding cells, but also that if the detainee was in need of a medic, the front desk staff would contact a doctor. [*Id.* at 58-59.] After they prepared the interview room, Vasquez and Figueroa went back downstairs, got Mayers from his cell, and brought Mayers upstairs. [*Id.* at 61, 74.] Vasquez did not remember the temperature of the interview room, but when she watched the video recording of the interview, she noted that she seemed to be comfortable. [*Id.* at 62.]

At the beginning of the interview, Vasquez read through the *Miranda* waiver form and she noticed that Mayers was paying attention and nodding in agreement to certain items she was reading. [*Id.* at 65.] After she was done reading him his rights, Mayers asked if he could write "RTS" or "refuse to sign." [*Id.* at 65-66.] Vasquez told him they weren't "playing games" and that he needed to sign his name on the form. [*Id.* at 66.] She told him that he would be signing the form to memorialize that she read the form and Mayers had been advised of his rights. [*Id.* at 67, 111.] Then, immediately after signing the form, Mayers jumped right in and just started talking. [*Id.* at 68.] According to Vasquez, Mayers did not seem to be overly emotional, distraught, or unstable. *Id.* At no point during the interview did Mayers indicate he did not want to talk with Vasquez and her partner. [*Id.* at 69.] She did not know at the time that he had been tased by an officer on the scene of the residence during a scuffle the day before the interview, and Mayers never requested medical attention or said he was in pain during the interview. [*Id.* at 69-72.] Mayers was offered water, and during the interview there were certain

9

questions Mayers did not want to answer, so Vasquez agreed with him and moved on. [*Id.* at 72.]

Finally, Anthony Mayers took the stand to testify about the voluntariness of his statement.   He stated that when the Gary Police Department initially entered his residence, he was hit, beaten, and kicked. [DE 125 at 178.]  He had been drinking at least a fifth and a pint that previous night, and was coming off of doing ecstacy. [*Id.* at 178-80.] Mayers had been up until about 3:00 or 4:00 a.m. drinking and popping pills, and he had only gone to bed around 6:00 a.m.  [*Id.* at 181.] The police removed him from the house and he sat out on the curb, barefoot, for about 20-30 minutes. [*Id.* at 185.] At the time, Mayers' dog was in the garage and he later found out that the police shot the dog dead. [*Id.* at 186.]  On the way to the police vehicle, Mayers and Officer Pawlak "exchanged some words," the officer swung and hit him in the head, and then Mayers was tased. [*Id.* at 186-88.]

Mayers was then taken to the jail. According to Mayers, the cell was filthy and cold, with feces on the wall. [*Id.* at 189.] Mayers was given a sandwich and water, but he did not eat the food. [*Id.* at 190-91.]  He stated that when Detective Vasquez first came to his cell, "whatever that they kind of really asked me to do in such a way, I was willing to do it to go home."  [*Id.* at 192.]  It was warmer in the interview room. [*Id.* at 193.] When Vasquez read him his rights, he "didn't want to sign it" but he felt like if he didn't comply, he would be put back in the cell. [DE 194-95.] Mayers felt like his statement was not voluntary because if he didn't comply with what they wanted him to

10

do, he didn't know what would happen. [*Id.* at 196.] On cross examination, Mayers conceded he was not handcuffed during the interview and they gave him some water to drink. [*Id.* at 204]. He made statements during his videotaped interview to Vasquez such as: "I'm just going to answer you straight up," "I'm just going to get straight to the point. I don't want to go back down there. I'm going to tell you what you need to know," and "I'm not trying to stop this thing. I ain't got to answer that." [*Id.* at 213-14.] When he refused to answer a question, the detective responded "absolutely, that's fair. I gave you that option and that choice, so we'll move on." [*Id.* at 214.] All in all, the interview lasted over two hours.

## Discussion

### I.       Reconsideration of Bill of Particulars

On June 21, 2024, a federal grand jury charged the defendant in an indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [DE 1.] On November 21, 2024, a five-count superseding indictment was returned charging Mayers with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and four additional counts of sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1). [DE 33.] On December 19, 2025, a federal grand jury returned a six-count second superseding indictment charging the defendant with an additional count of forced labor, in violation of 18 U.S.C. §§ 1589 and 1594(a). [DE 89.] Mayers was arraigned on the second superseding indictment on January 8, 2026. [DE 96.]

11

On November 3, 2025, Mayers filed a motion for a bill of particulars related to the superseding indictment. [DE 70.]  On December 17, 2025, the government filed a response. [DE 87.]  After the second superseding indictment was filed, I denied Mayers' initial motion with leave to file another motion for a bill of particulars. [DE 113.]

On February 27, 2026, Mayers filed a motion requesting the Court reconsider its denial of the motion for bill of particulars. [DE 123.]  In the motion for reconsideration, Mayers limits his request to the human trafficking offenses (Counts Two through Six) and does not request the Court reconsider its ruling denying a bill of particulars as to Count One, charging the defendant with being a felon in possession of a firearm. [*Id.* at 1.]

As to the human trafficking offenses, Mayers makes two requests for particularity: (1) a request for the "identities of the alleged victims"; and (2) a request for "relevant dates and events for each charge." [*Id.* at 1-2.]

The government declares that after Mayers was arraigned on November 2, 2024 (on the first superseding indictment), the government produced and made available to Mayers a significant volume of discovery including: copies of Mayers' interview with law enforcement; numerous Gary Police Department police reports; FBI reports detailing the investigation and interviews with witnesses and victims; search warrant returns and photographs; Mayers' cellular telephone extraction; relevant body-worn camera footage; 911 call recordings; interview recordings; and other records and materials.  From my perspective, discovery has been provided to Mayers on a timely

12

and ongoing basis.

Counts Two through Six each charge Mayers with a human trafficking offense related to a different single victim in each count (Individuals One, Two, Three, Four, and Five), and each count alleges a time range that the crime was allegedly committed: Count Two (December 2019 - October 2022); Count Three (October 2021 - December 2021); Count Four (September 2022 - November 2022); Count Five (August 2023 - August 2024); and Count Six (September 2021 - November 2023).

Let's address Mayers' arguments regarding the names of the alleged victims. First, Mayers complains about the newly added Count 6, because it regards "Individual Five and another person." [DE 123 at 2.]  However, as explained by the government, Count Six does not list multiple "victims."  Count Six only charges the defendant for "knowingly provid[ing] and obtain[ing] the labor and services of a person, that is Individual Five." [DE 89 at 6.]  While the prohibited means used to obtain such labor can include threats and other means against "Individual Five and another person," the offense only relates to a single victim.  *Id.*

Most importantly, the government vows in its memorandum that it was preparing to produce a victim key specifically identifying for the defense each of the individuals referenced in the second superseding indictment. [DE 127 at 5.]  The government pledged it would produce the victim key to the defense the week of March 16, 2026, pursuant to the Court's Protective Order. [DE 46.]  I take the government at its word that the victim key was disclosed, and this should satisfy Mayers' request for the

13

"identities of the alleged victims." [DE 123 at 2.]

As to Mayers' second request for the "relevant dates and events for each charge" [DE 123 at 2], I think the government has provided Mayers with an abundance of discovery detailing the relevant dates, making a bill of particulars unnecessary because any additional "information the defendant seeks is readily available through alternate means such as discovery." *United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013). Because each offense is tied to Mayers' conduct against a single victim, and the discovery includes interview recordings and reports with each of those individual victims, Mayers already possesses this information through discovery.

What's more, the crime of human trafficking is a continuing offense. It doesn't necessarily happen in a moment in time. It's for this reason, as the government points out, plenty of human trafficking cases have denied identical requests for a bill of particulars, finding the indictment and discovery materials were sufficient. *See, e.g.,* *United States v. Modugumudi*, No. 18 CR 262-1, 2020 WL 733102, at *2 (N.D. Ill. Feb. 13, 2020); *United States v. Obie*, No. 1:18-CR-007-ODE-JKL, 2018 WL 4896726, at *1 (N.D. Ga. Oct. 9, 2018); *United States v. Gibbs*, No. CR 23-00035 (MN), 2024 WL 1198055, at *3 (D. Del. Mar. 20, 2024). These cases all rejected defendants' requests for bills of particular, even when the indictments charged trafficking offenses over extended time periods. This is partly due to the nature of these offenses, which often do not occur at a single moment in time. *See Modugumudi*, 2020 WL 733102, at *2 (describing that certain single offenses in an indictment, like a count of sex trafficking can "permissibly allege 'a

14

continuing course of conduct'" and can "encompass [] all acts against [a] victim within a set time period."); *Obie*, 2018 WL 4896726, at *3 (the indictment charged "violations [that] were ongoing and 'continu[ed] through' the time periods provided" and the "Government [was] not offering a time period and alleging that, at some undetermined point therein, Defendant once violated 18 U.S.C. § 1591; rather, the Government [was] alleging that many violations occurred against each named victim during the provided time periods.").

Under the circumstances, because Mayers is alleged to have committed numerous acts against each victim within the time periods charged in the indictment, and he was given ample discovery related to each victim, including victim statements, Mayers is not entitled to a bill of particulars. *See Modugumudi*, 2020 WL 733102, at *3 (holding discovery detailed all of the facts the defendant was seeking and provided the defendant "with enough information to ascertain the nature of the charges against him and to allow him to prepare an adequate defense."). For all of these reasons, the Motion for Reconsideration of Bill of Particulars [DE 123] is denied.

## II.    Motion to Suppress Statement

Mayers seeks suppression of a statement he gave to Detective Vasquez and her partner, Detective Figueroa. Mayers' challenge to the admission of his custodial interrogation presents two questions: (1) whether he received and validly waived his *Miranda* rights; and (2) whether his statements themselves were otherwise voluntary. *See Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004).

15

Recall that Mayers was arrested around 3:30 p.m. on November 29, 2023, and he was interviewed a little less than 24 hours later, around 2:55 p.m. the next day. [Govt. Ex. 9.]  As documented by the video recording, Vasquez read Mayers the *Miranda* form out loud, and Mayers nodded along.  Detective Vasquez asked Mayers if he understood what she had read to him, and he nodded in agreement.  She asked if he had any questions, and Mayers shook his head 'no.' [DE 84, time stamp 5:50.]  Then Mayers stated, "Can I put RTS?  I heard you, but it's really, you know what I mean?" Vasquez replied, "Actually, I don't. What's RTS" And he said, "Refuse to sign, but I [unintelligible] my signature, but I'll go right ahead and I'll get straight to the point just because I [unintelligible] . . . ."  Vasquez then responded, "OK, so we're not going to play games.  You're not going to refuse to sign.  This is just, by signing it, it just means I read it to you and that you understand it."  Mayers replied, "So I can just give you my initial?"  And Vasquez answered, "Your signature is required on this line here."  Mayers then signed the *Miranda* waiver form. [Gov. Ex. 9.]

Vasquez first asked if he resided in Glenwood, Illinois.  It was clear from the video that Mayers was chomping at the bit to talk because he immediately launched into an explanation of the previous day's events.  When the officers questioned him about the inconsistencies in his story about how many firearms he owned, Mayers declined to answer, stating "I don't wanna answer that, you did say I don't have to answer that.  I don't wanna answer that."  Detective Vasquez immediately agreed, saying "I did give you that option and you do have the choice and that's fair.  Ok, so

16

we'll move on then, before moving to a different line of questions." [DE 84, time stamp 31:58.]

Once again, later in the conversation Mayers appears irritated, he sighs and notes he was answering all their questions, but the police had told him he did not have to answer all of them.  Detectives Vasquez and Figueroa assured him that was the case and they would ask him questions until Mayers no longer wanted to talk with them. [*Id.*, time stamp 1:55:50.]

Let's look at the *Miranda* waiver issue first.  It is well settled that the Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. V.   The Supreme Court created a protective rule that requires officers to advise a suspect in custody of his rights to remain silent and to counsel before they start an interrogation.  *Miranda v. Arizona*, 384 U.S. 436 (1966). This was the impetus of the now infamous "Miranda warning."  Of course, an individual in custody can voluntarily waive his *Miranda* rights if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *United States v. Bailon*, 60 F.4th 1032, 1036-37 (7th Cir. 2023).

*Miranda* waivers can be express or implied.  *United States v. Thurman*, 889 F. 3d 356, 364 (7th Cir. 2018).  An implied waiver "may be inferred from a defendant's understanding of [his] rights coupled with a course of conduct reflecting [his] desire to give up [his] right to remain silent."  *United States v. Smith*, 218 F.3d 777, 781 (7th Cir.

2000).  In determining whether Mayers voluntarily waived his *Miranda* rights, the Court

should look at the totality of the circumstances.  "Factors considered in the analysis

include the defendant's background, experience, and conduct," *United States v. Huerta*,

239 F.3d 865, 873 (7th Cir. 2001), as well as the law enforcement officer's attitude and

whether they used coercive techniques.  *United States v. Bailon*, 60 F.4th 1032, 1037 (7th

Cir. 2023).

Of course, a person can also revoke the waiver at any time and in any manner, by

cutting off questioning and that course of action must be honored by the authorities.

*Michigan v. Mosley*, 423 U.S. 96, 103 (1975).  The burden is on the person in custody to

make a "clear and unambiguous assertion" of their rights, at which point officers must

cease their questioning. *Thurman*, 889 F.3d at 364.  Overall, the government must prove

the defendant validly waived his *Miranda* rights by a preponderance of the evidence.

*Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

In this case, Mayers claims he didn't voluntarily sign the *Miranda* waiver—he

initially refused to sign it, then asked if he could write "rts" (or refuse to sign).  But then

he immediately said, "but I'll go ahead and get straight to the point," and then was told

by Vasquez that he must sign the waiver form. [DE 71 at 3.]  Mayers claims he was

actually coerced into signing the form. [*Id.* at 4.]  But the video contradicts this

contention.  First, it is obvious that Mayers was paying attention to the reading of his

rights, as he was nodding along.  *See Zachary v. Finnan*, 436 F. App'x 682, 685 (7th Cir.

2011) ("By nodding, [defendant] signaled that he understood the rights [the officer] was

18

explaining to him."). Vasquez read each provision of the form slowly and deliberately, pausing several times to make eye contact with Mayers to make sure he was paying attention and grasping the content. Everyone in the room was seated, Mayers was not handcuffed, and he appeared to be comfortable. At the end of reading the form, Vasquez asked if he understood the form or had any questions, and Mayers nodded no.

Second, to the extent Mayers claims he was tricked when Vasquez told him, "[t]his is just, by signing it, it just means I read it to you and that you understand it," this doesn't equate to involuntarily signing the form. The form itself reads:

> I have read the foregoing statement of my rights and I am fully aware of the said rights. I do not desire the services of any Attorney at this time and before proceeding with the making of any statement or during the course of any conversation with any Police Officers, and hereby waive said right. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me to procure any statement or induce any conversation. That the statement I am about to give is the truth and I give it of my own free will.

[Gov. Ex. 9.]

While a wavier can be invalid if a defendant shows by clear and convincing evidence that officers "affirmatively misled" the defendant, and such "misinformation was material in his decision to speak with agents," *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir 1983), in this case I don't think there was any affirmative misstatement.[1]

---

[1] To the extent Vasquez's statement can be considered a misrepresentation, the fact that an agent makes misrepresentations to a defendant, while relevant, is "insufficient . . . to make [an] otherwise voluntary confession inadmissible." *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); compare with *United States v. Giddins*, 858 F.3d 870, 885 (4th Cir. 2017) (finding a defendant's will was "overborne or his capacity for self-

The content of the form itself confirms that Mayers was read his rights and understood them, that it relates to his right to counsel, and establishes no promises have been made. "[S]atisfaction of *Miranda* does not turn on the precise formulation of the warnings, but rather, on whether the warnings convey to [a suspect] his rights." *United States v. Frankson*, 83 F.3d 79, 81 (4th Cir 1996); *see United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996) (finding voluntary waiver even though the officer said "if he wished to continue making statements about his case and to have his questions about his case answered by the agents, he would have to sign the waiver form."); *United States v. Ray*, No. 3:19-CR-46 JD, 2020 WL 1643711, at *8-9 (N.D. Ind. Apr. 2, 2020) (where defendant argued the agents did not tell him he was signing a *Miranda* rights waiver form, that when the form was read verbatim aloud to him before he signed it, and he did not request clarification, he voluntarily waived his *Miranda* rights).

Let me be clear about it. Detective Vasquez should not have told Mayers to stop "playing games" and sign his name on the form. But the act of signing the waiver was not actually a "relinquishment of his rights," as Mayers argues. [DE 71 at 4.] Mayers absolutely retained the right not to talk to Detective Vasquez even after he signed the form, as she herself reminded him multiple times during the interview. Looking at the totality of the circumstances, after Mayers signed the form, Vasquez asked him where he lived, and then Mayers immediately launched into a lengthy statement about what

determination critically impaired" where he voluntarily went to the police station under the pretense of retrieving an impounded car, was repeatedly told he was not under arrest or investigation, but was interrogated anyway).

20

had happened to him the previous day.  It is very clear that Mayers was eager to tell his story.  His immediate willingness to talk to Vasquez after being read his *Miranda* rights is proof of a knowing waiver of his Fifth Amendment right to remain silent.

What's more, although Mayers ultimately signed the waiver, courts have held that a refusal to sign does not in itself render a statement involuntary.  A refusal to sign a written waiver does not automatically render an accused's statement inadmissible. *See United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) ("waiver may be inferred from the defendant's conduct, even when [defendant] has refused to sign a waiver form.").  So where a defendant is advised of his *Miranda* rights (like in this case) and still chooses to speak with his interrogators, a knowing and intelligent waiver of those rights may be inferred from the circumstances.  *See Patterson v. Illinois*, 487 U.S. 285, 292-96 (1988).  In other words, it is almost irrelevant that Mayers actually signed the form in this case because the totality of the circumstances indicate that he was advised of his rights, he understood them, and yet he still continued in his conviction to talk to the investigators.

Mayers' second main argument is that the surrounding circumstances rendered his statements involuntary. [DE 71 at 5.]  Specifically, he points to the fact that he was physically injured by officers (recall he was tased the day before), allegedly verbally abused, his dog was killed, he was transported to the Gary City Jail without shoes or a jacket, and then was held in a cold cell under disgusting conditions. [*Id.* at 5-6; *see also* Mayers' hearing testimony.]

21

A confession is voluntary if, considering the totality of the circumstances, it is the "product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Huerta*, 239 F.3d at 871 (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). In deciding whether a confession was voluntary, courts assess "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dassey v. Dittmann*, 877 F.3d 297, 303 (7th Cir. 2017) (quotation omitted). "Coercive police activity is a 'necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Dillon*, 150 F.3d at 757 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). In other words, a defendant arguing his confession was involuntary "must show that the police engaged in coercive practices." *Dassey*, 877 F.3d at 303. Otherwise, a statement is voluntary and admissible if, under the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogations tactics that have overcome the defendant's free will. *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012).

Ultimately, the government must prove by a preponderance of evidence that a defendant's confession was voluntary. *United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012). But, it is important to note that Mayers must present "definite, specific, detailed and nonconjectural facts" to establish "a disputed issue of material fact as to

the voluntariness of his confession." *United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004). In determining voluntariness, and measuring whether Mayers' "will was in fact overborne," *Miller v. Fenton*, 474 U.S. 104, 116 (1985), I should look at the characteristics of Mayers, the details of the interrogation (including the setting and whether any tactics were used), any vulnerabilities of Mayers, his age, intelligence, education, and familiarity with the criminal justice system. *Dassey*, 877 F.3d at 303-05.

Here, Mayers has not showed that the agents engaged in coercive practices. I have watched the lengthy video clip. Mayers appears clear-headed and articulate. He was not slurring his words, he appropriately responded to questions, and there is no indication he is under the influence during the interview. The questioning appeared conversational, Mayers is brought water, and he is allowed to stand up, stretch, and move around the interview room. There is no indication that Mayers is suffering any effects of being tased, or effects from the police allegedly physically abusing him the previous day. Mayers does not mention any physical discomfort, or request any type of medical care. And in any event, a violent arrest does not render a subsequent statement involuntary. *See Watson v. DeTella*, 122 F.3d 450, 454 (7th Cir. 1997) (confession four hours later not involuntary when defendant was kicked in the head during an arrest four hours before); *United States v. Young*, 377 F. App'x 965, 969 (11th Cir. 2010) (same); *United States v. Harper*, 466 F.3d 634, 643-44 (8th Cir. 2006) (same); *United States v. Irons*, 646 F. Supp. 2d 927, 965 (E.D. Tenn. 2009) (arrest where defendant was tased did not influence defendant during interview thirty minutes later).

23

While it is true that Mayers complains that the holding cell is cold (and the officers acknowledge that fact and ask him if he has a blanket) [DE 84, time stamp 1:24:50], at times during the actual interview, Mayers fans himself, wipes sweat from his brow, and complains he is warm.  It is true that Mayers might have been under some physical discomfort.  But a suspect's physical pain or drug use does not make a confession involuntary as a matter of law.  *See United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998).  And in this case, because the interview occurred almost 24 hours after he was arrested, it is unlikely Mayers would have been feeling any effects of alcohol or drug usage from the night before he was arrested.  Under the circumstances that are plainly evident from the video recording, Mayers was able to make a coherent decision to confess voluntarily.  There is no evidence whatsoever of any coercive police activity relative to his statement.

What's more, Mayers is no rookie in the criminal justice system.  He was previously convicted of a felony theft, attempted resistance of a peace officer, felony escape, felony aggravated battery of a peace officer and fleeing/attempted eluding. [Bond Report, DE 11, at 3-7.]  At the time of his arrest, he was 33 years old, and a high school graduate. [*Id.* at 1-2.]  Consequently, Mayers was not "disadvantaged by youthful ignorance or the naivete born of inexperience."  *United States v. Oglesby*, 764 F.2d 1273, 1278 (7th Cir. 1985).  His familiarity with the criminal justice system weighs against Mayers' insistence that his conversation with the officers was not voluntary.

For all of these reasons, Mayers' statement to the police was voluntary.  There

24

were no coercive police tactics employed whatsoever—rather, his statement was the result of informed and rational free will.  Consequently, the motion to suppress his statement will be denied.

**III.    Motion to Suppress Evidence Seized from the 2508 Jefferson Ave. Residence**

Mayers first argues that the search warrant for the residence lacked probable cause because it merely relied upon the statements made by Individual 4 (the woman who escaped out the back of the residence and then made a statement at the hospital). [DE 73 at 4, 5.]  He takes issue with Individual 4's alleged uncorroborated statements, and requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  First, I'll cover some standards that are applicable to this argument, and then I'll address the substance.

"A search warrant affidavit establishes probable cause when it sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *United States v. Gregory*, 795 F.3d 735, 741 (7th Cir. 2015) (citation omitted).  Where the issuance of a search warrant is based entirely on an affidavit, "the validity of the warrant depends solely on the strength of the affidavit." *United States v. Johnson*, 867 F.3d 737, 741 (7th Cir. 2017) (citing *United States v. Carson*, 582 F.3d 827, 831-32 (7th Cir. 2009)). A reviewing court gives "great deference" to the conclusion of the issuing judge that there was probable cause to support the warrant. *United States v. Robinson*, 724 F.3d 878, 884 (7th Cir. 2013).

Under *Franks*, a defendant is entitled to an evidentiary hearing on the truthfulness of information submitted in a search warrant application if he can make a

"substantial preliminary showing" that: (1) the warrant application contained a material misstatement or omission that would alter the issuing judge's probable cause determination; and (2) the affiant included or omitted the information intentionally or with a reckless disregard for the truth. *United States v. Clark*, 935 F.3d 558, 562 (7th Cir. 2019); *Franks*, 438 U.S. at 155. However, if a finding of probable cause is supported even without the false statements, "a hearing is unnecessary and the motion should be denied." *United States v. Mullins,* 803 F.3d 858, 862 (7th Cir. 2015); *see also United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016) (the false statement must have been "necessary to support the finding of probable cause."). *Franks* hearings are "rarely held" because "[t]hese elements are hard to prove." *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000). In this case, Mayers has not come close to meeting his burden.

In evaluating whether Mayers is entitled to a *Franks* hearing, it is important to keep in mind the substantial preliminary showing that he must first make "is not met by mere conclusory statements" or "self-serving statements." *United States v. Taylor*, 154 F.3d 675, 679-80 (7th Cir. 1998). Rather, the defendant's "allegations must be accompanied by an offer of proof" such as affidavits or sworn statements. *Franks*, 438 U.S. at 171. *Franks* "applies to omissions as well as affirmative misrepresentations." *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016) (citing *United States v. Mullins*, 803 F.3d 858, 862 (7th Cir. 2016)). But when relying on omissions, the defendant "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless

26

disregard." *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990) (overruled on other grounds).

At the first step, I have to consider whether a statement is "material." A material misstatement affects the probable cause determination. In other words, if I set aside that statement and there remains sufficient facts to support probable cause, the statement is not material. *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003). Probable cause exists when a judge can "make a practical, commonsense decision" that "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Rees*, 957 F.3d 761, 766 (7th Cir. 2020). Probable cause "depends on the totality of the circumstances – the whole picture – not each fact in isolation." *Id.*

At the second step, the defendant must show the misstatement or "omission was designed to mislead or was made in reckless disregard of whether it would mislead." *United States v. McMurtrey*, 704 F.3d 502, 511 n.5 (7th Cir. 2013). The focus should be on the officer who submitted the affidavit, and whether he "perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009). "It is not enough to show that [the person quoted in the affidavit] lied to the government officer, who then included those lies in the complaint." *Id.*

Mayers points to a number of things that he says mandates a *Franks* hearing. These include: "Individual 4 was able to call 911 and eventually exit the residence,"

27

"the Affidavit's suggestion that the Defendant would not let her leave is baseless"; because there was no blood on Individual 4's person or clothing when she met with Detective Vasquez, the injury that she was receiving treatment for likely occurred weeks earlier; because Individual 4 was also injured in September 2023 and sought help at a nearby establishment, she could not have been held captive since August 2023; the medical records do not note "additional injuries" besides the injury to the nose, so she could not have been subjected to daily beatings; Detective Vasquez made a false statement when she said the victim reported Mayers withheld food from her; and Detective Vasquez omitted from the affidavit that the victim's initial test screens were positive for trace amounts of cocaine. [DE 73 at 4-9.] Any omission that might have been made is easily characterized as immaterial, as are the alleged inconsistencies between the alleged facts and what was included in the affidavit. *See United States v. Bacon*, 991 F.3d 835, 841 (7th Cir. 2021) (finding no error in denial of *Franks* hearing because omissions were immaterial as they were "clear from the face of the affidavit."). "[A] police officer applying for a search warrant must always select, deliberately, which information about an investigation to give the judge and which information to leave out." *McMurtrey*, 704 F.3d at 511 n.5.

It is clear Mayers believes Detective Vasquez (or other agents) should have put in more work investigating the victim, arguing the affidavit lacks corroboration of the victim's allegations. [DE 73 at 4.] But arguing the authorities could have (or should have) done more doesn't necessitate a *Franks* hearing. *See, e.g., United States v. Swanson*,

28

210 F.3d 788, 791 (7th Cir. 2000) (describing allegation that "investigators should have done more work" as insufficient to meet "high standard required for convening a *Franks* hearing."); *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000) ("[t]he fact that [defendant] can point out additional things which could have been done but were not does not in any way detract from what was done.").

In this case, Mayers' assertions are unsupported and self-serving, and frankly, deal with trivial details. Recall the sequence of events in this case—where the authorities received a 911 call from a woman with a broken nose, who was being held hostage by Mayers. Recall further that the victim mouthed to the police through a window the words "help me." Then, while the police were engaged with Mayers, she managed to escape out the back door when authorities pleaded for her release, and then the victim was interviewed first hand by Detective Vasquez in the hospital. Presumably time was of the essence, and the police needed to move quickly to preserve any evidence that they might be able to collect. Law enforcement acted in good faith providing the judge with the material facts it had at the time of the warrant, and these facts absolutely reached the minimum cause threshold to obtain a warrant. Mayers' quibbling over small details years later, with no hard evidence showing the victim was not telling the truth, does nothing to advance his case at this time. *See Johnson*, 580 F.3d at 671 ("If [defendant] believes that [the affiant] lied, he must support that allegation with an offer of proof, *see Franks*, 438 U.S. at 171, which he has not done."). For all of these reasons, a *Franks* hearing is not necessary.

29

During the hearing, another issue came up regarding the timing of the receipt of the second warrant and the legality of the residential search.  It was revealed that Detective Vasquez (who was already on the scene pursuant to the first warrant) received the e-mail from Prosecutor Westberg and believed they had already obtained the second warrant (when in fact the second warrant had not yet been signed).  Recall the first search warrant was received around 1 p.m. and executed around 3:23 p.m.  At this time Detective Vasquez observed evidence of sex trafficking in a "sex room" and told Prosecutor Westberg about her findings.  Westberg then began drafting the second search warrant to authorize the seizure of additional items.  Vasquez received an e-mail from Westberg around 4:08 p.m., which the text started as: "here is a further warrant for the house."  [Gov. Ex. 6.] Vasquez  read this e-mail on her phone, and testified "[i]t was my understanding when I received that e-mail from her that we had received that second warrant." [DE 124 at 50.]

This was a mistake.  In reality, Westberg was asking Vasquez to review *a draft* of the second warrant before it was submitted to the judge.  Nevertheless, the police were already properly inside the residence by virtue of the first warrant— the one signed at around 1:00 pm.  The magistrate judge officially signed the second warrant around 7:08 p.m.  According to testimony from the hearing, law enforcement did not leave the residence with all of the items collected from the search until sometime between 7:40 p.m. and 8:00 p.m.  Vasquez testified they left the house "7:40 at the earliest and maybe 7:50 at the latest" [DE 124 at 127]. (Detective Nielsen said it was even later — he recalled

leaving "around 8:30 p.m.," as documented on his time sheet for overtime.) [DE 125 at 176.]

Law enforcement didn't actually seize Mayers' property until they left the property, well after the second search warrant was officially obtained. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109 (1984). As the Court in *Segura v. United States*, 468 U.S. 796, 798 (1984) found, even if there was a seizure of the contents of the apartment when the premises was secured, the seizure did not violate the Fourth Amendment:

> where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

This is because once an occupant is arrested and in police custody, "the actual interference with their possessory interest" becomes "virtually nonexistent." *Id.* at 813.

Here, Mayers has not shown any possessory interest that was affected during the period when officers searched his house pursuant to the first lawful 1 p.m. warrant, until the items left his house around 8 p.m. To the contrary, law enforcement had probable cause to enter the residence and seize cell phones and electronic devices, written documentation related to human trafficking, firearms and ammunition, and

31

money or payment in reference to illegal activity pursuant to the first warrant. After making entry, the authorities quickly found probable cause to request a second search warrant for further items based on their observations of the premises and the "sex room." And the second warrant was ultimately signed at 7:08 p.m., unequivocally before any items left the residence. Because Mayers was in police custody during this time, there was no interference with his possessory interests.

Finally, even if those additional evidence items were considered "seized" before the second 7:08 p.m. warrant was signed, that evidence would still be admissible under the inevitable discovery doctrine. "The inevitable discovery doctrine provides that illegally obtained evidence will not be excluded if the government 'can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Haldorson*, 941 F.3d 284, 293 (7th Cir. 2019) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The government has shown by a preponderance of the evidence that it "would have obtained . . . legal justification for conducting the search that would have led to the" seizure of the items -- indeed, that is exactly what happened here. The fact that law enforcement did ultimately obtain the second warrant shows they were going to (and *did*) receive the authority to go ahead to obtain this evidence lawfully (pursuant to the second warrant). For these reasons, the motion to suppression evidence recovered from the Jefferson Street residence must be denied.

### IV.    Motion to Suppress Contents of Cell Phone

The final issue concerns the validity of the search of the contents of a cell phone recovered from Mayers' home.  Defendant moves to suppress "all evidence . . . attained as a result of the search of the contents" of a silver Apple iPhone 13 Pro Max recovered from the defendant's residence alleging that Gary Police "officers accessed the content of the iPhone prior to obtaining a warrant" based on the "information used in the warrant to describe the telephone." [DE 74 at 4, 2.] The issue has been extensively briefed.  The government filed a response [DE 88], the defendant filed a reply [DE 99] and after the evidentiary hearing, Mayers filed a supplemental brief [DE 122] and the government filed a response to the supplement [DE 128].

Even assuming some evidence in the search warrant affidavits was unlawfully obtained (namely: the identifying information of the phone and the silver iPhone name, "Mo3 iPhone"), the remainder of the untainted information in the applications was more than enough to independently establish probable cause.  Alternatively, the exclusionary rule should not be applied because the discovery of the evidence was inevitable and federal law enforcement acted in good faith in relying on the evidence provided by state law enforcement.

Let's recap of the facts relating to the cell phone.  Recall that pursuant to the first search warrant, Gary Police recovered a cell phone associated with Mayers (the only person in the residence at the time of the search).  It is described as a silver Apple iPhone 13 Max.  Vasquez testified during the hearing that after Mayers was arrested

and removed, Crime Scene Investigation Sergeant Flores entered the residence and photographed it.  In particular, CSI photographed the living room area, and the silver iPhone was resting on a window ledge. [Gov. Ex. 2, 3.] When it was first observed, it was unlocked, the display was lit, and it appeared logged into a "Smart Camera" application. [Gov. Ex. 3.]   By the time Vasquez entered the residence, she observed the iPhone on a radiator, and plugged in to charge. [DE 124 at 36.]  While the application appeared to be displaying a slightly different screen [Gov. Exs. 3, 5], Vasquez had not touched it or had any interaction with the phone at this point. [DE 124 at 40-41.]

In preparation of drafting a second search warrant, Prosecutor Westberg asked Vasquez to provide her with identifiers for the device, such as the serial or IMEI number, to better describe the phone in the warrant application. [*Id.* at 138-39.] Vasquez testified that she wasn't very familiar with Apple iPhones, but she thinks another Gary Police Officer accessed the settings for her and then held it in his (or her) hand while Vasquez took a photo. [*Id.* at 42-45; Gov. Ex. 12B.] Vasquez unequivocally testified she "knew [she] obviously, couldn't go into the phone without obtaining a second warrant, which [she] had planned on doing at a later date and time." [*Id*. at 49.]  She stated she did not access any other information on the silver iPhone and no other officer communicated anything to her about it save from what she could view on the settings page. [*Id.* at 45, 128.]  To her knowledge, nothing else was obtained from the phone. *Id.*

On December 1, 2023, Gary Police applied for a search warrant of the silver iPhone, which was identified by make and model, model number, serial number, and

34

phone name "Mo3 iPhone." [DE 124 at 75; *see* Gov. Ex. 10 (Lake County Superior Court Affidavit and Search Warrant).] A magistrate judge in Lake County Superior Court signed a search warrant for the device on the same day as the application, and, on December 4, 2023, the Lake County High Tech Crime Unit extracted data from the silver iPhone pursuant to that search warrant. [*Id.* at 75-76.] After the phone was processed by the High Tech Crime Unit, Vasquez transferred it to Special Agent Broc Verschoor with the FBI. [*Id.* at 77.]

Months later, on May 6, 2024, Special Agent Broc Verschoor, in an abundance of caution and based on the broader federal investigation, applied for a federal search warrant of the same silver iPhone, which the FBI had received from Gary Police. The federal search warrant identified the silver iPhone using the same identifiers as the Lake County Superior Court warrant—make and model, model number, serial number, and phone name "Mo3 iPhone." [*See* Gov. Ex. 11 (Northern District of Indiana Application, Affidavit, and Search Warrant).] The thirty-eight-page warrant affidavit included a single sentence related to these identifiers in the probable cause section: "The iPhone had a displayed name as 'Mo3 iPhone' which law enforcement believes is a reference to [the defendant's] moniker 'Moe.'" [*Id.* at ¶ 46.] Magistrate Judge John E. Martin signed a search warrant for the silver iPhone on the same day as the FBI application, and, on approximately May 14, 2024, an FBI agent extracted data from the silver iPhone.

On November 29, 2023, when the search warrant was executed at the

defendant's residence, Detective Vasquez was not aware that the FBI was conducting a separate investigation into the defendant. [DE 124 at 79.] (Recall that Vasquez is with the Gary Police Department.)  The FBI was not present and had no involvement with the premises search warrant on November 29, 2023, the interview of the defendant on November 30, 2023, or the state search warrant of the silver iPhone. *Id.*  Detective Vasquez also did not assist the FBI in drafting the later federal search warrant of the silver iPhone. *Id.*

First, it is important to note that it seems that the only data retrieved from the cell phone was the identifiers.  Defendant argues it is "clear the illegal observation of the contents of the iPhone included the identifying information and *much more*" [DE 122 at 3 (emphasis added)], but the record simply does not support that.  Vasquez unequivocally, and credibly testified that she did not access any other information or data from the phone herself and to her knowledge, no other officer did.  She said she wasn't looking for photos, or evidence, she was merely retrieving the phone identification that Prosecutor Westberg requested she obtain for the application for the second warrant.

To the extent Mayers argues a further search of the cell phone must have occurred based on the slightly different display depicted on the phone after it was moved to the radiator [DE 122 at 2; compare Gov. Ex. 3 and Gov. Ex. 5], both screens depict the same "Smart Camera" home surveillance app, and there is no evidence in the record that indicates a person (versus an automatic change based on connection, motion

36

activation, or some other update) caused that change in the display.

So, it is clear that the only thing accessed from the phone was in the settings (captured by the photograph Vasquez took of the phone identifiers, pictured in Gov. Ex. 12-B). Also, it is obvious that when looking at the affidavit, no information derived from accessing the silver iPhone prior to obtaining a search warrant was included in the state search warrant application (other than the phone identifiers).

Nevertheless, Mayers argues that because the phone identifiers were accessed, this was a warrantless search and all of the cell phone information (from the state search and later FBI investigation) must necessarily be suppressed. Mayers' tunnel-vision version of the law is simply incorrect. Mayers claims *Riley v. California*, 573 U.S. 373 (2014) justifies suppression. However, *Riley* dealt with two *warrantless* searches of data stored on two defendants' cell phones who were arrested, and the police searched digital information on their phones (including pictures, videos, and data about where one defendant lived). In *Riley*, no warrant *was ever obtained* to search either defendant's phone, and the Court concluded that "[o]ur answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple – get a warrant." *Id.* at 403. That is precisely what law enforcement did in this case—and they did it twice.

A more accurate summary of the applicable law is that even where a search warrant is "obtained, in part, with evidence which is tainted," the warrant "can still support a search if the 'untainted information, considered by itself, establishes probable

cause for the warrant to issue.'" *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005) (quoting *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991)). Thus, while a defendant might rely on a "*Riley* violation" [DE 122 at 3] to support the suppression of evidence obtained pursuant to a warrantless search, such an analysis is entirely inapplicable to the discussion of evidence obtained pursuant to subsequent search warrants, which is what happened in this case. Applying the relevant standard in *Gray* and other courts in this circuit like *United States v. Scott*, 731 F.3d 659, 664 (7th Cir. 2013), and *United States v. Shelton*, 997 F.3d 749, 770 (7th Cir. 2021), it is clear that both the state and federal search warrant applications were sufficient to establish probable cause even after excising any potentially tainted information (the phone's identifiers) which was received before the state search warrant.

Let's look at the state search warrant first. Even after excising the phone's identifiers from the state search warrant, the remaining (untainted) evidence would still provide the magistrate judge with probable cause to issue the warrant. In the state warrant affidavit, Vasquez described in depth the Gary Police Department's response to the 911 call, their arrival on the scene, Mayers refusing to allow the female to leave, and after she finally escaped out the back, her transport to the hospital for medical attention. [Gov. Ex. 10, 1-3.] As described in the affidavit, in an interview the woman described the man in the residence: (1) had been "holding her there against her will and forcing her to have sex with him and other men for money"; (2) "beat[] her on a daily basis and fire[d] gunshots at her often" at the residence; (3) and withheld "food from her as a

38

form of punishment." *Id.* The woman described that "she [was] in fear for her life" and had "been too afraid to leave due to him beating her and shooting at her." *Id.* Detective Vasquez further detailed in the affidavit that, at the time of the interview, the woman "appeared to have a broken nose," and she "stated that he punched her in the nose" the night before. *Id.* The affidavit goes on to explain the woman specifically described the man used "his Apple iPhone to communicate with men online to arrange for her to have sex with them in the basement apartment at 2508 Jefferson Street," for his profit. *Id.* Moreover, the victim relayed that Mayers used his phone to post advertisements of her, set up dates, upload videos and photos, and to accept cash payments via cash app." [*Id.* at 2.]

In addition to this first hand-account, Vasquez had her own observations of the "sex room" once she lawfully entered the residence during the search, as well as other indicators of crime strewn about like bullet holes, spent casings, currency, and condoms in the residence. *Id.* This huge volume of evidence (including observations from the scene and the witness interview) easily establishes that even assuming the phone identifier was tainted and obtained illegally, that information did not "affect[] the judge's decision to issue the warrant" and overwhelming probable cause still supported the issuance of the state search warrant even with that information excised. *Scott*, 731 F.3d at 664. Finally, the hearing testimony demonstrated that the decision to seek the warrant for the phone was not prompted by the identifiers obtained from the phone—indeed, Prosecutor Westberg and Detective Vasquez were working together to

39

obtain a second warrant as soon as Vasquez saw what was inside that residence.

For the same reasons (and maybe even to a greater extent), excising this information from the federal warrant application does not affect that probable cause determination either. As detailed in the federal affidavit, the federal investigation preexisted the state investigation and had identified several other victims and witnesses of the defendant's trafficking scheme (in addition to the woman in the state search warrant affidavit). [DE 88 at 6-7.] Even assuming that certain of the device's identifiers constituted tainted information, the remainder of the information included in the voluminous thirty-eight-page federal search warrant affidavit (including a confidential informant, a number of police complaints, recorded jail calls, and a number of victims) still establishes overwhelming probable cause for the issuance of the warrant. [*See* DE 88 at 6-11; Gov. Ex. 11.]

In response, Mayers argues that the government has not offered any testimony from the federal affiant to assess the extent of reliance on information allegedly tainted by the state actors. [DE 122 at 5.] But there is no evidence whatsoever that anything was tainted other than the silver iPhone's identifiers. Mayers' insinuation to the contrary is unsupported speculation. *See United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality" and reliance on "vague, conclusory allegations is insufficient."). And that does not justify requiring the federal affiant to testify. I am quite comfortable relying on the lengthy federal affidavit itself, and it is evident from

40

that text that it did not rely on any illegally obtained information. *See United States v. Bell*, 925 F.3d 362, 371 (7th Cir. 2019) (finding where there was only one sentence in an affidavit that was allegedly tainted, the other facts were "sufficient to establish probable cause . . . even absent the description of the" unlawfully obtained evidence).

The federal search warrant affidavit contains an array of facts that encompass the FBI's much broader investigation and evidence of Mayers' alleged human trafficking operation, and this multitude of facts clearly prompted that warrant. Even excising the cell phone's identifiers, there was overwhelming probable cause to support the issuance of the warrant.

What's more, even if one found the allegedly tainted identifiers of the cell phone were necessary for probable cause for the warrant (which, as I already covered, is doubtful given the mountain of other evidence in the search warrant affidavits), the inevitable discovery doctrine "permits the government to introduce evidence seized in violation of the Fourth Amendment 'if the Government can prove, by a preponderance of the evidence, that the officers' ultimately or inevitably would have . . . discovered [the challenged evidence] by lawful means.'" *United States v. Howard*, 729 F.3d 655, 663 (7th Cir. 2013) (quoting *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir.2009)); *see, e.g., United States v. Gravens*, 129 F.3d 974, 979 (7th Cir. 1997) ("[I]t is well established that the inevitable discovery rule provides exception to the exclusionary rule's requirement that evidence tainted by official wrongdoing be suppressed."). Where the prosecution can make such a showing, "the deterrence rationale [of the exclusionary

41

rule] has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

The doctrine of inevitable discovery applies if the government shows by a preponderance of the evidence: "(1) that 'it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence' and (2) 'that it would have conducted a lawful search absent the challenged conduct.'" *Howard*, 729 F.3d at 663 (quoting *Marrocco*, 578 F.3d at 637-38). In this case, as the hearing testimony demonstrated, the officers had an "independent, legal justification for conducting a search" of the defendant's silver iPhone. *Id.*  As described above, even excising the challenged data—the identifiers depicted in Government's Hearing Exhibit 12-B—the state and federal search warrants were still supported by ample probable cause.  The remaining probable cause establishes that Gary Police Department had an "independent, legal justification for conducting a search" of the defendant's phone. *Id.* And in this case, the officers conducted an otherwise lawful search absent the challenged conduct (pulling up the cell phone identifiers).

And finally, even if one could say the allegedly tainted information was necessary for the probable cause determination, I still wouldn't exclude evidence recovered from the federal search warrant because those officers relied in good faith upon the work of the previous state officers.  In the federal search warrant affidavit, the FBI specifically described their intent and purpose in applying for a subsequent search

42

warrant for the silver iPhone:

> While GPD has performed its own forensic search on the phone through the Lake County Prosecutor's Office High Tech Crime Unit, the FBI seeks to perform its own examination. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws and that the scope of the search conforms with the crimes that the FBI is investigating.

[*See* Gov. Ex. 11 at ¶ 63.] It is apparent that the FBI acted in good faith in relying on the information provided by the Gary Police Department. Even if one small piece of information was tainted, exclusion is not proper because "the process that resulted in the application for, and execution of, the federal search warrant reflected good faith on the part of the federal agents." *United States v. Lickers*, 928 F.3d 609, 619 (7th Cir. 2019) (applying good-faith analysis set forth in *United States v. Leon*, 468 U.S. 897 (1984)).

## Conclusion

For all of the aforementioned reasons, Anthony Mayers' (1) Motion to Suppress Defendant's Statement [DE 71]; (2) Motion to Suppress Evidence Seized from the Residence at 2508 Jefferson Avenue Basement Apartment [DE 73]; (3) Motion to Suppress Search of Contents of Cell Phone [DE 74]; and (4) Motion for Reconsideration of Bill of Particulars [DE 123], are ALL DENIED.

ENTERED: April 8, 2026.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

43